IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **TRACY LANGIANO** | § | |
| | § | |
| Plaintiff, | § | **Civil Action No.** |
| | § | |
| VS. | § | _____ |
| | § | |
| **CITY OF FORT WORTH, TEXAS;** | § | |
| **AND LANDON ROLLINS** | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES Tracy Langiano and files this lawsuit for violation of his civil rights, in support of which would respectfully show the Court the following.

I. JURISDICTION AND VENUE

1. Plaintiff brings this action under the U.S. Constitution and 42 U.S.C. §1983. Jurisdiction is based on 28 U.S.C. §§1331, 1343(a)(3)-(4).

2. Venue is proper in this Court under 28 U.S.C. §1391(b)(1)-(2) as the county in which all or part of the cause of action arose.

II. PARTIES

3. Plaintiff is a resident of Tarrant County, Texas.

4. At all relevant times, the Defendant officer acted as an agent and employee of the City of Fort Worth under color of law. As such, he was responsible for upholding the laws of the United

States and Texas.  He may be served at the Fort Worth Police Department,  Bob Bolen Public Safety Complex, 505 W. Felix St., Fort Worth, TX  76115.

5. Defendant City of Fort Worth, may be served through its Mayor Mattie Parker or its Secretary, both located at 200 Texas St., Fort Worth, TX  76102.

### III. STATEMENT OF FACTS

6. This case arises out of shooting of Tracy Langiano on July 28, 2020.

7. On July 27, 2020 Mr. Langiano and his family encountered some personal issues which caused him to leave his home and check into a motel.  He packed a few things and also took with him his licensed and legal firearm.  He checked into a motel at approximately 3 a.m. on July 28, 2020 and went to sleep.

8. Mr. Langiano woke up later that morning, went to a 7-11 and got some sandwiches and milk, returned to his room, ate the sandwiches, and drank the milk.  He called one of his sons to let him know that he was doing fine and was going to get some rest.  Mr. Langiano laid down to sleep.  He was on his left side with his back to the door.  His registered gun was in its holster and on the nightstand.

9. At some point earlier, one of Mr. Langiano's sons had contacted the Fort Worth police to say that he was concerned for Mr. Langiano's state of mind and his welfare, indicating that he may try and harm himself.  There was no indication or representation that Mr. Langiano posed a danger to any other person.  He had committed no crime and was not suspected of committing a crime in connection with this "welfare check."

10. The Fort Worth police dispatched officers to try and locate Mr. Langiano to check on his welfare.  His vehicle was located at a local motel.  Defendant Rollins and another officer,

Guadarrama, obtained a key from the motel clerk for unannounced, warrantless and illegal entry into Mr. Langiano's motel room.

11.     Defendant Rollins and Officer Guadarrama did not knock on the motel room door.  They did not announce themselves.  They took no action to alert Mr. Langiano that two police officers were entering his room.  They took no action to ascertain Mr. Langiano's welfare before their illegal entry.

12.     At the time that Defendant Rollins and Officer Guadarrama burst into Mr. Langiano's motel room, he remained sleeping on his left side, with his back to the door and the registered gun in its holster on the night-stand.

13.     When Defendant Rollins burst into Mr. Langiano's room, he immediately pointed his gun at Mr. Langiano, yelled "gun" and immediately began shooting.  Mr. Langiano had not turned over, was not facing Defendant Rollins, did not have a weapon and was not reaching for his holstered weapon.  He obviously posed no immediate threat to any persons, including the officers.  Defendant Rollins shot Mr. Langiano multiple times in the lower back and buttocks. All bullet wounds were to his lower back and buttocks as reflected:



14. Mr. Langiano was transported to John Peter Smith with multiple gun-shot wounds to the buttocks and back. He was found to have peritonitis and underwent exploratory laparotomy with revealed significant injuries from the bullet fragments. He was transferred to the Intensive Care Unit for resuscitation and developed severe complications. He has had numerous surgeries, will require many more and has sustained permanent and disabling injuries.

## IV. CAUSES OF ACTION

15. Paragraphs 6—14 above are hereby incorporated into these counts of Plaintiff's Complaint.

16. Tracy Langiano's rights were violated in contravention of the Fourth Amendment of the United States Constitution. Mr. Langiano suffered severe, disabling and permanent injuries as a result of the unconstitutional actions of Defendants.

A.  THE INDIVIDUAL OFFICER

17. Plaintiff sues officer Rollins under 42 U.S.C. § 1983 for violations of Mr. Langiano's Fourth Amendment rights in that he employed unnecessary, unjustified and excessive force and restrained Mr. Langiano's liberty.

18. The Supreme Court held in *Tennessee v. Garner,* 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), that "the use of deadly force violates the Fourth Amendment unless 'the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'" Further, "it is well-established that 'the excessive force inquiry is confined to whether the [officers or other persons were] in danger at the moment of the threat that resulted in the [officers' use of deadly force]." *Amador v. Vasquez*, 961 F.3d 721, 728 (5th Cir. 2020). *Harper v. McAndrews*, 499 F. Supp. 3d 312, 331 (E.D. Tex. 2020). It is clear that in the case *sub judice*, there was no immediate threat or danger to the officers who were

entering Mr. Langiano's motel room. He was not reported to be a danger to others, he did not make any threat of harm to anyone, he did not have physical possession of his registered gun and he was not reaching for it when he was shot. He remained laying in his bed with his back to the door and the officers.

19. In assessing a claim of excessive force, courts ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). "A court (judge or jury) cannot apply this standard mechanically." *Kingsley v. Hendrickson*, 576 U.S. 389, 397, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015). Rather, the inquiry "requires careful attention to the facts and circumstances of each particular case." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. Those circumstances include "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley*, 576 U.S. at 397, 135 S.Ct. 2466. *Lombardo v. City of St. Louis, Missouri*, No. 20-391, 2021 WL 2637856, at *1 (U.S. June 28, 2021). Applying the *Kingsley* factors, there was no need for any force at all— much less deadly force; the injuries to Mr. Langiano were severe, life threating, disabling and permanent; there was no effort by Defendant Rollins to temper or limit the deadly force used; there was no security problem at issue because Mr. Langiano had committed no crime, was not suspected of committing a crime in connection with this welfare check, had not threatened anyone and was not holding or pointing a weapon; there was no immediate threat that could have been reasonably perceived by the officers; Mr. Langiano was asleep and not resisting in any way.

20.     To "gaug[e] the objective reasonableness of the force used by a law enforcement officer, we must balance the amount of force used against the need for force." *Ikerd v. Blair,* 101 F.3d 430, 434 (5th Cir. 1996)(citing *Spann v. Rainey,* 987 F.2d 1110, 1115 (5th Cir.1993)). *Flores v. City of Palacios*, 381 F.3d 391, 399 (5th Cir. 2004). When an officer uses deadly force, the "objective reasonableness" balancing test is constrained. It is objectively <u>unreasonable</u> to use deadly force "unless it is necessary to prevent [a suspect's] escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Garner,* 471 U.S. at 3, 105 S.Ct. 1694. As stated, the force used was not necessary to prevent an escape (this was a welfare check, not an arrest) and there was no immediate threat of death or serious physical injury.

21.     For a right to be clearly established at the time, "[t]he contours of that right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). "The central concept [of the test] is that of fair warning: The law can be clearly established despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Kinney v. Weaver,* 367 F.3d 337, 350 (5th Cir. 2004)(quoting *Hope v. Pelzer,* 536 U.S. 730, 740 (2002)). *Flores v. City of Palacios*, 381 F.3d 391, 399–400 (5th Cir. 2004). It was clearly established on July 28, 2020 that deadly force could not be used on someone who was not escaping and who did not pose an immediate threat of serious physical injury to the officers. The Fifth Circuit has held that the excessive force inquiry is confined to whether the officer "was in danger at the moment of the threat that resulted in the [officer's] shooting [of the victim]." *Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 493

(5th Cir. 2001). "So, the focus of the inquiry should be on 'the act that led [the officer] to discharge his weapon[.]" *Amador v. Vasquez*, 961 F.3d 721, 728 (5th Cir. 2020) (quoting *Manis v. Lawson*, 585 F.3d 839, 845 (5th Cir. 2009)). It was clearly established on July 28, 2020 that deadly force could not be used on someone who was not escaping and who did not pose an immediate threat of serious physical injury to the officers.

22. The facts of the case *sub judice* establish as a matter of law that the use of deadly force under the circumstances was unreasonable. *See Amador*, 961 F.3d at 728-29 (finding genuine issues of material fact as to reasonableness of excessive force when officers shot the plaintiff when he was standing motionless thirty feet away from the officers with his hands in the air); *Cullum v. Siemens*, No. SA-12-cv-49-DAE, 2013 WL 5781203, at *9–10 (W.D. Tex. Oct. 25, 2013) (finding deadly force was unreasonable because the armed suspect's hand was "palm-up in a 'stop' gesture" that was "submissive" and he did not present an immediate threat); *Jamison v. Metz*, 541 F. App'x. 15, 19–20 (2nd Cir. 2013) (holding that officers were not entitled to qualified immunity where the suspect had stopped and was in an act of surrendering by putting his hand in the air); *Robinson v. Nolte*, 77 F. App'x. 413, 414 (9th Cir. 2003) (holding that the use of deadly force violated the suspect's Fourth Amendment rights where the suspect had "his arms raised over his head in a classic surrender position, with a gun in his lap"). *Hernandez v. Causey*, No. 2:17-CV-123-TBM-MTP, 2021 WL 1771876, at *9 (S.D. Miss. May 4, 2021) ("the law is clear. Every reasonable officer would have understood the Fourth Amendment is violated when deadly force is used on an unarmed man, who is standing motionless, with his hands raised"). *Harper v. McAndrews*, 499 F. Supp. 3d 312, 331 (E.D. Tex. 2020)("The Court finds that if a jury accepts Plaintiff's version of the facts as true, during the two minutes not shown on the body camera video, the jury could conclude that Sgt. McAndrews

violated Mr. McAfee's clearly established right to be free from excessive force"). As the Fifth Circuit noted in its *en banc* opinion in *Cole v. Carson*, 935 F.3d 444, 447 (5th Cir. 2019) (*en banc*): "We conclude that it will be for a jury, and not judges, to resolve the competing factual narratives as detailed in the district court opinion and the record as to the ... excessive-force claim."

23. The actions were objectively unreasonable and no officer under the circumstances would have shot a sleeping man who posed no immediate threat in the back and buttocks.

B.   CITY OF FORT WORTH

24. A municipality is liable if it causes a constitutional tort through "a policy statement, ordinance, regulation, or decision officially adopted or promulgated by that body's officers." *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). *Harper v. McAndrews*, 499 F. Supp. 3d 312, 320 (E.D. Tex. 2020) A single incident of unconstitutional activity will not suffice to hold a municipality liable unless a plaintiff establishes that it was caused by an existing unconstitutional "official policy." *Worsham v. City of Pasadena*, 881 F.2d 1336, 1339 (5th Cir. 1989). Official policy is either an officially adopted policy or a widespread practice so common as to constitute a custom that fairly represents municipal policy. *Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1985). A single incident of a violation "accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability." *Bd. of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 409, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).

   1.   Absence of Policy

25.     The absence of a policy can be the basis for municipal liability if such absence was the moving force behind a constitutional violation. *Harper v. McAndrews*, 499 F. Supp. 3d 312, 324 (E.D. Tex. 2020).  In *Harper*, it was determined that a reasonable jury could find that the absence of a policy requiring two officers to respond to a call for a welfare check was the moving force behind the death of the decedent.  In the case *sub judice*, the City failed to have policies requiring attempted verbal contact with the subject of the welfare check or verbal identification by the officers of their presence prior to a physical encounter, such failure being the moving force behind the shooting of Mr. Langiano.

26.     The Fort Worth Chief of Police is the "policymaker" with respect to General Orders applicable to officers obtaining medical treatment for persons being taken into custody asking for medical treatment or exhibiting signs of medical distress.  The authority to address policies relating to such issues is delegated to the Chief in the Fort Worth Municipal Code.  Pursuant to the Fort Worth Municipal Code Part II, Chapter 1, section 1-2:

> **DELEGATION OF AUTHORITY.** Whenever a provision appears requiring a city officer or employee to do some act or make certain inspections it is to be construed to authorize the head of the department to designate, delegate and authorize subordinates to perform the required act or make the required inspection unless the terms of the provision or section designates otherwise.

27.     In Fort Worth Municipal Code, Chapter 27, Art. II, the duties of the Chief of Police are addressed specifically.  The Chief of Police is tasked with the administration and operation of the police department including the "promulgat[ion of] all rules, regulations and orders for the governing of the police department."

28.     The Personnel Rules and Regulations for Commissioned Police Officers ( "PDPRRs") of the City of Fort Worth are authorized under the City of Fort Worth Municipal Code, Chapter 2, Article V.  The PDPRRs state that "[t]he Police Chief may generally approve departmental

policies (General Orders) that are more restrictive or controlling than policies in these PDPRRs so long as they do not conflict with federal, state or local law, or any then-applicable labor agreement."

29. Thus, the policymaker with respect to the General Orders governing use of force and/or welfare checks is the Fort Worth Chief of Police. Each of the lawsuits and claims listed below were reported to both the Chief of Police and to the City Council. The relevant policymaker was aware of the need for a policy addressing the use of force in welfare checks and made a deliberate decision not to promulgate such a policy or provide training to officers in that regard.

    2. Inadequate Training/Supervision

30. For an inadequate training claim, plaintiffs must establish (1) an inadequate training policy; (2) deliberate indifference in adopting the training policy; and (3) that the inadequate training policy directly caused the plaintiff's injury. *Benavides v. County of Wilson*, 955 F.2d 968, 972 (5th Cir. 1992). Deliberate indifference in adopting the training policy is found when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). *Harper*, 499 F. Supp. 3d at 320–21.

31. Under the circumstances presented, it is highly predictable that a failure to properly train officers on how to conduct proper welfare checks could lead to an improper use of force. The Defendant officer failed to attempt verbal contact with Mr. Langiano, failed to ascertain his state of mind at the time of the encounter, failed to attempt to ascertain Mr. Langiano's intentions, failed to announce himself, made an illegal entry into Mr. Langiano's hotel room and immediately began shooting when there was no immediate threat presented. Had Defendant

officer been properly trained, these events would not have unfolded as they did. Mr. Langiano had a calm and rational discussion with his son by cell phone prior to falling asleep. Had the Defendant officer called Mr. Langiano's cell (and/or son), he could have determined that Mr. Langiano was in a calm and rational state of mind with no intention of hurting himself or any other person. Had the Defendant officer simply knocked on Mr. Langiano's hotel room door and/or announced himself, he would have received the same information. Further, had the Defendant officer been properly trained, he would not have panicked and begun shooting when there was no threat present. The failure of the City to provide appropriate training on these issues amounts to deliberate indifference.

32. Additionally, upon information and belief, Defendant Rollins had a history of using excessive force/shooting unnecessarily prior to the incident with Mr. Langiano of which the City was aware. Such history should have, at the very least, put the City on notice that Defendant Rollins was in need of additional or different training regarding the use of force, particularly in welfare checks where no crime has been committed and the citizen is not being detained or arrested.

   3.  Pattern

33. There has long been a pattern of instances of encounters between Fort Worth police officers and purported detainees and/or "welfare checks," resulting in the death of the detainee/welfare check recipient from unnecessary and excessive force. Despite this pattern, the City failed to adopt policies or provide training to its officers with respect to unjustified excessive and/or deadly force.

34. <u>Atatiana Jefferson:</u> On October 12, 2019, Fort Worth police officers shot through Ms. Jefferson's window, killing her immediately. The shooter, Officer Aaron Dean, was indicted for

murder. Officer Dean was known by the Fort Worth Police Department to have "tunnel vision" and the need to improve communication with the public and fellow police officers. Just as in the instant case, the officers had been called to Ms. Jefferson's home for a "welfare call." The City acknowledged that Dean violated departmental policies on use of force, de-escalation and unprofessional conduct. Despite direct knowledge of its officers' pattern of violating use of force and de-escalation policies, the City failed to provide further appropriate training on such matters to its officers. Media reports reflect that there were at least nine shootings by Fort Worth police officers in 2019, killing at least six people.

35. <u>Cody Seals</u>: June 2019, was shot and killed by Fort Worth officers during an encounter where Seals was unarmed and holding only a flashlight.

36. <u>April 25, 2017</u>: An (as yet unidentified) individual who was suicidal was shot and killed by Fort Worth police.

37. <u>May 20, 2016</u>: An (as yet unidentified) individual who was not exhibiting or carrying any weapon was unjustifiably shot during a foot pursuit by Fort Worth police.

38. <u>David Collie</u>: July 27, 2016, David Collie, an unarmed black man, was unjustifiably shot in the back while he was walking away from a Fort Worth police officer.

39. <u>Jeremi Rainwater</u>: December 19, 2015, late at night, Mr. Rainwater heard his dogs barking. They continued to bark as if seeing something or someone unusual. Eventually, Mr. Rainwater went out on his porch with his registered pistol in his hand, pointed toward the ground. He looked around but, not seeing anything, turned to go back into his house. As he began to try and re-enter his home, Mr. Rainwater was unjustifiably, and without warning, shot twice in the back by Fort Worth police.

40. <u>Phillip Vallejo</u>:  In July 2015, Phillip Vallejo and his wife had dinner at a Fort Worth restaurant.  As they left, there was a brief altercation with other patrons.  Mr. and Mrs. Vallejo then stood by their vehicle discussing the situation.  A Fort Worth police officer arrived and, inexplicably, shot Mr. Vallejo repeatedly in the back.  After Mr. Vallejo collapsed to the ground, bleeding profusely from the bullet wounds, the officer handcuffed him while Mr. Vallejo cried out for help, stating that he could not breathe.  Other officers were also present and all ignored Mr. Vallejo's pleas and obvious serious distress, responding by yelling at Mr. Vallejo to "shut the f*** up."  Even after paramedics arrived, the officers refused to allow them to treat Mr. Vallejos while they examined the manner of entrance/exits of the bullets and concocted a version of events different than what occurred, failing themselves even to provide basic aid.  Mr. Vallejo was pronounced dead at the hospital.  Again, Fort Worth policymakers were aware of the incident as Mrs. Vallejo filed a lawsuit against the City of Fort Worth and the Fort Worth Police Department.

41. <u>Ali Al-Srogy</u>:  July 13, 2014, Mr. Al Srogy was asleep, unarmed, in his bed in his home.  Two Fort Worth police officers, apparently in response to a CIT call (person in psychiatric distress) entered his home and unjustifiably used excessive force, including the shooting of a taser.

42. <u>Jerry Waller</u>:  May 28, 2014, Mr. Waller was unjustifiably shot and killed in his garage by Fort Worth police who were investigating a burglary call but were at the wrong house.  Mr. Waller heard noises outside and, to protect himself, got his registered firearm and went into his garage to see if there was an intruder.

43. <u>Jermaine Darden:</u>  In May 2013, Fort Worth police raided a home and encountered, among others, Jermaine Darden laying on a couch.  The officers wrestled Mr. Darden to the

floor, where he was gasping for breath, telling the officers that he could not breathe and others were notifying the police that he was asthmatic and could not breathe. Despite this information, the officers ignored his pleas regarding his medical condition, failed to provide him assistance and failed to obtain medical treatment for him. Mr. Darden died as a result of the encounter. Fort Worth policymakers were aware of this event as a lawsuit was brought against the officers and the City.

44.    Cordell Davis:  February 28, 2011, Mr. Davis was a passenger in a vehicle driven by Charal Thomas. Fort Worth police attempted to arrest Thomas for misdemeanor traffic warrants. Mr. Thomas left the scene driving his vehicle with Mr. Davis still a passenger. One of the officers jumped onto the vehicle's running board and began firing his gun indiscriminately into the vehicle, striking and injuring Mr. Davis who eventually flung himself out of the vehicle to escape further bullets.

45.    Michael Jacobs:  In April 2009, Fort Worth police were called to a residence where a young man was in a state of a mental health crisis and his parents were asking for help to get him medical assistance. The police arrived at the scene and paramedics also arrived. Despite the fact that it was a call for medical assistance and despite Michael Jacobs' obvious mental distress, the police officers directed the paramedics to leave the scene. One of the officers then deployed a taser on Michael Jacobs for 49 seconds while his mother was yelling that the officer was killing her son. The officers subsequently had the paramedics return and Michael Jacobs was transported to the hospital, where he was pronounced dead. Again, Fort Worth policymakers were aware of the incident as the family of Mr. Jacobs filed a claim against the City of Fort Worth and the Fort Worth Police Department, which was resolved through mediation.

46. Plaintiff has listed many instances where officers used excessive, unjustified deadly force. Plaintiff asserts that there are other—perhaps many other—instances of such conduct as reflected in media reports and would seek permission from the Court to conduct discovery against the City to ascertain all other instances/complaints of excessive and unjustified force and/or deadly force. However, even without additional instances of such conduct, there is a sufficient pattern to establish a claim for the failure of the Fort Worth police to train officers and/or establish necessary policies.

47. As a result of Defendant's actions described, Mr. Langiano has suffered extreme pain and anguish. Defendants' acts, omissions, policies, procedures and/or customs as set forth above are the proximate cause of substantial damages to Tracy Langiano, including severe pain and suffering, both emotional and physical. The Defendants had fair notice and thus knew or should have known that shooting a person in the back who has not committed a crime, has not threatened another person and did not pose a threat to another person is in violation of the Constitutional and statutory protections afforded to Tracy Langiano. This law was clearly established at the time of the injury.

48. Defendants' conduct has violated the Fourth amendment to the United States Constitution. Plaintiff is entitled to recover physical pain and mental anguish in the past and future, economic damages in the past and future, medical expenses in the past and future, compensatory damages in the past and future, attorneys' fees, costs, litigation expenses, and expert fees, as allowed, as well as pre-judgment and post judgment interest as allowed by law, pursuant to 42 U.S.C. §1988, 12205.

## V. JOINT AND SEVERAL LIABILTY

49. Defendants are jointly and severally liable.

## VI. DEMAND FOR JURY

50. Plaintiff requests a trial by jury.

## CONCLUSION AND PRAYER

THEREFORE, Plaintiff prays for judgment against Defendants for actual and compensatory damages, declaratory relief, and for statutory attorneys' fees, costs, and expenses, punitive damages against the individual Defendant and pre-judgment and post judgment interest. Finally, he seeks all other additional relief as the Court deems just and proper.

Respectfully submitted,

s/Susan E. Hutchison
Susan E. Hutchison
Texas Bar No. 10354100
sehservice@FightsforRight.com

HUTCHISON & FOREMAN, PLLC
505 Pecan St., Ste. 102
Fort Worth, TX  76102
(817) 336-5533
817.887.5471 fax

ATTORNEYS FOR PLAINTIFFS